O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FDIC, ) <br> ) <br> Plaintiff(s), ) <br> ) <br> v. ) <br> ) <br> FIRST AMERICAN TITLE ) <br> INSURANCE COMPANY, ) <br> ) <br> Defendant(s). ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> _____ ) | CASE NO. SACV 10-0713 DOC (MLGx) <br><br> **O R D E R DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF FDIC'S MOTION FOR SUMMARY ADJUDICATION** |

Before the Court are Defendant First American Title Insurance Company's Motion for Summary Judgment (dkt. 15) and Plaintiff FDIC's Motion for Summary Adjudication (dkt. 20). The Court has considered the moving, opposing, and replying papers, as well as oral arguments, and DENIES Defendant's Motion ("DMSJ") and GRANTS Plaintiff's Motion ("PMSA").

**I.     Background**

The facts in this case are largely undisputed.  The Court summarizes the factual history below and will address other facts as relevant throughout this Order.

1        Plaintiff FDIC ("Plaintiff" or the "FDIC") filed its Complaint against First American Title
2   Insurance Company ("Defendant" or "First American") on June 3, 2010 as the Receiver for
3   IndyMac Bank, F.S.B. ("IndyMac"). IndyMac served as a lender to buyer Steven Darling
4   ("Darling" or "Buyer") to secure the purchase of a single family home on August 17, 2007. D.J.
5   Bushway ("Bushway"), an escrow officer at First American, served as the escrow holder for
6   Darling. Bushway also served as IndyMac's closing agent.
7        The FDIC's claim for breach of contract in this case centers on the Closing Instructions
8   IndyMac provided to First American, and which First American signed. The Closing
9   Instructions required First American to inform IndyMac if its escrow agent knew of a transaction
10  involving the same borrower taking place within 180 days of the closing. First American failed
11  to inform IndyMac of the existence of two other mortgage loans on additional properties that
12  Bushway helped Darling to purchase at around the same time. The FDIC contends that this
13  constituted a breach of the contract created by the Closing Instructions because when First
14  American signed the Closing Instructions, it was agreeing not to authorize to close the loan if it
15  knew of another transaction involving Darling or, if it did know of other transactions, to notify
16  IndyMac in writing of any other transactions prior to closing. Because Bushway was involved in
17  all three of the transactions, the FDIC insists that First American knew of those transactions and
18  its closure of the loan using IndyMac funds on August 17, 2007, without revealing that
19  knowledge of other transactions, immediately breached the agreement. The FDIC avers that
20  IndyMac would not have entered into the loan had it known of Darling's other purchases, which
21  would have dramatically changed his debt-to-income ratio. As a result of First American's
22  failure to disclose its knowledge of the other transactions, the FDIC contends that IndyMac
23  entered into a loan it would not have otherwise taken on, and as a result, Darling defaulted after
24  only two payments. As a result, the FDIC requests damages of $447, 280 plus interest, costs,
25  and attorney's fees.
26       First American argues that even if a contractual relationship existed as a result of the
27  Closing Instructions, it sent IndyMac an additional document, a "Funding Letter," along with the
28  signed Closing Instructions. First American maintains that the Funding Letter served to modify

any contract formed by the Closing Instructions. Because IndyMac received the Funding Letter prior to funding the loan, and thereafter funded the loan, and because the terms of the Funding Letter indicated that the act of funding the loan constituted acceptance, First American insists that IndyMac accepted the Funding Letter's terms.

The Funding Letter provided that First American was committing to "perform only those functions customarily handled by settlement agents processing loans in the geographic area where the land is located and will not accept responsibility for the performance of any other matters addressed in your closing instructions." First American therefore argues that it acted in full compliance with the Funding Letter because the custom in Southern California is not to report knowledge of other transactions.

Defendant First American moves for summary judgment and Plaintiff the FDIC moves for summary adjudication as to the issue of liability.

**II.     Legal Standard**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the opposing party must set out specific facts showing a genuine issue for trial; merely relying on allegations or denials in its own pleading is insufficient. *See Anderson,* 477 U.S. at 248-49. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio*

*Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

**III.  Discussion**

This case involves only one cause of action: breach of contract. The essential elements of a breach of contract claim are: (1) the existence of a contract, (2) plaintiff's performance or excuse for not performing under the contract, (3) defendant's breach, (4) damage to plaintiff. *First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001).

The FDIC alleges that the Closing Instructions established a contract through which First American was required to inform it of other transactions involving the buyer; that First American breached the terms of its contract pursuant to the Closing Instructions; that IndyMac performed under the contract by financing the relevant purchase; and that it has been damaged because of First American's breach, because had it known of the other transactions it would not have financed the purchase of the property, on which Darling defaulted. First American does not challenge that IndyBank performed on the contract; instead, the thrust of its challenge involves the terms of the relevant contract, its denial that it breached those terms, and its argument that it did not cause the damages IndyMac incurred.[1]

**A.  The Operative Contract**

First American suggests that no contract between the parties actually existed based on the Closing Instructions, as it insists that there was no provision in the Escrow Instructions requiring

---

[1] In its Opposition to the PMSA, First American raises, for the first time, a challenge to the FDIC's standing to bring this action. The Court rejects that argument, as the FDIC explicitly retained the right to sue on the Darling loan, among others, in its Purchase and Assumption Agreement. *See* Declaration of Dana Clausen ("Clausen Decl."), Ex. A. Though IndyMac sold some of its assets to One West Bank in March 2009, the FDIC alone had the rights to sue on the loans, so that right was not transferred to One West Bank in the IndyMac sale. *See* Reply to PMSA, 1-2.

it to comply with IndyMac's Closing Instructions.  Nonetheless, for the purposes of First American's Motion, it appears to accept that the Escrow Instructions instructed it to comply with IndyMac's Closing Instructions.  *See* Defendant's Motion for Summary Judgment ("DMSJ"), 8.  Indeed, California Law establishes that escrow holders are to carefully comply with lender's closing instructions.  *Amen v. Merced County Title Co.*, 58 Cal. 2d 528, 531-32 (1962).  By signing the Closing Instructions, First American entered into a contractual relationship.  *See, e.g.*, *Plaza Home Mortg. v. North American Title Co., Inc.*, 184 Cal. App. 4th 130, 140 (2010).  As a result "[u]pon the escrow holder's breach of an instruction that it has contracted to perform . . . the injured party acquires a cause of action for breach of contract."  *Amen*, 58 Cal. 2d at 531-32.  Therefore, the Court focuses on the parties' dispute over the terms of the governing contract.

It is undisputed that First American signed IndyMac's Closing Instructions on August 13, 2007.  *See* Declaration of Ignacio Gomez ("Gomez Decl."), ¶ 10, Ex. C.  The very first paragraph of the Closing Instructions states that, "[y]ou are *not authorized to close* this transaction *unless you can strictly comply* with these instructions."  It also explains that the Instructions can "*only* be changed, modified or waived *in writing and delivered or telecopied to [First American]* by an authorized agent . . . ."  Declaration of Dana Clausen ("Clausen Decl."), ¶ 7, Ex. F.  The second paragraph continues, "[y]ou are to make *no changes* to the documents *without lender's written authorization*."  *Id.*  The FDIC therefore argues that because Bushway signed the Closing Instructions, without making any alterations or amendments, First American had consented to the contract.

Provision 10 of the Closing Instructions provides that:
> You are not authorized to close this loan if:
>
> 10.  A transaction becomes known to you on or before the date of closing that involves the borrower(s) or if you have knowledge of a transaction involving the subject property in the last 180 days.  Notify the lender, in writing, of the additional transaction to verify that it has been considered in our loan approval decision.

*See id.*  The FDIC insists that at the moment First American signed the instructions, First

1  American had already breached its contract because the Instructions provided that it could not
2  sign if it had knowledge of other transactions by the buyer and First American did, in fact, know
3  of other transactions.  First American maintains that the Closing Instructions are not the
4  operative contract because it returned the Funding Letter along with the Closing Instructions.
5  On August 13, 2007, First American sent the Funding Letter, along with Darling's loan
6  documents and signed Closing Instructions, to IndyMac.  Declaration of Vicki Hinkle ("Hinkle
7  Decl."), ¶ 9, Ex. B.  First American attaches the same Funding Letter to all the funding packages
8  it sends to its lenders.  Deposition of D.J. Bushway ("Bushway Dep."), 64-67.  That Funding
9  Letter stated that:

> In acting as settlement agent for this transaction, First American Title Company
> will perform only those functions customarily handled by settlement agents
> processing loans in the geographic area where the land is located and will not
> accept responsibility for the performance of any other matters addressed in your
> closing instructions.  Funding of this loan shall be considered your acceptance of
> the First American Title Company position, your confirmation that all your
> conditions have otherwise been satisfied and your direction to First American Title
> Company to close the loan and to have the loan policy issued.

18  Hinkle Decl., ¶ 9, Ex. B.
19      First American asserts that the Funding Letter constituted a rejection of the Closing
20  Instructions, or, alternatively, modified the Closing Instructions and that IndyMac manifested
21  acceptance of those modifications.  It further argues that its subsequent failure to notify
22  IndyBank about other purchases was consistent with the Funding Letter's requirements.

### 1. Modification Requirements

24      A party is permitted to issue a qualified acceptance to an offer, which then becomes the
25  new proposal.  Cal. Civ. Code § 1585.  California law allows a contract to be modified in writing
26  or by oral agreement.  Cal. Civ. Code § 1698; *Vella v. Hudgins*, 151 Cal. App. 3d 515 (1984).
27  Any modifications to a contract must provide additional consideration.  *See* 1 Witkin, Summary
28  10th, Contracts, § 218 (2005) ("Under the definition of consideration in Cal. Civ. Code § 1605,

1  doing or promising to do what one is already legally bound to do cannot be consideration for a
2  promise."). *See, e.g.*, *Power Service Corp. v. Joslin*, 175 F.2d 698, n.4 (9th Cir. 1949).

3  First American argues that even if the Funding Letter did not constitute a rejection of the
4  Closing Instructions, the Funding Letter modified the Closing Instructions, or, at least rendered
5  its acceptance of the Closing Instructions "conditional." *See* Defendant's Opposition to PMSA
6  ("Opp'n to PSMJ"), 13. It is undisputed that First American signed IndyMac's Closing
7  Instructions. Nonetheless, First American asserts that because it signed the Closing Instructions
8  but returned them along with the Funding Letter, the Funding Letter's terms modified the
9  Closing Instructions and thus became the controlling agreement. Not only did IndyMac stamp
10 the letter "Received August 14, 2007," but First American contends that an IndyMac
11 representative signed the Funding Letter, thereby expressing IndyMac's acceptance of the
12 written terms set forth in the Funding Letter. The FDIC contends, however, that not only had
13 First American already signed and thereby agreed to the Closing Instructions, but the Funding
14 Letter was merely a cover letter, bearing no signature, and did not serve as a modification of the
15 Closing Instructions.

16 The Closing Instructions specified that modifications must not only be in writing but must
17 also be "delivered or telecopied" by an "authorized agent" of IndyMac to First American, and
18 must be signed. Therefore, the Closing Instructions could not have been altered by a letter from
19 First American to IndyMac; instead, an authorized agent of *IndyMac* was required to have
20 modified them and delivered them to First American. First American has not presented any
21 evidence that this occurred.

22 Moreover, the Funding Letter, were it intended to modify the Closing Instructions or
23 serve as conditional acceptance of the Closing Instructions, masked that purpose fairly well. To
24 begin with, First American's own cited authority reveals the problem with its argument that the
25 Funding Letter was a conditional acceptance. A conditional acceptance is a counteroffer that
26 serves to reject the original offer. *Panagotacos v. Bank of America*, 60 Cal. App. 4th 851, 855
27 (1998). If the Funding Letter were intended to be a counteroffer, however, First American
28 should not have signed the Closing Instructions; it should only have responded with the Funding

7

1 Letter. Yet First American signed the Closing Instructions without any indication of conditional
2 acceptance on the document. It did not cross out any terms, and it did not mention anywhere on
3 the Closing Instructions the existence of the Funding Letter. Instead, Bushway signed the
4 Instructions following the line: "SETTLEMENT AGENT AGREES TO CLOSE THIS LOAN
5 IN ACCORDANCE WITH ALL OF THE INSTRUCTIONS."

Though the Funding Letter's language contradicts the signed Closing Instructions, it could not override that agreement simply by its attachment to the Closing Instructions. Instead, as the FDIC emphasizes, First American merely returned the signed Closing Instructions with the attached Funding Letter. This appeared to IndyMac to be just a cover letter, as it states, "In connection with the above referenced loan, we enclose executed loan documents and required items as per your instructions. Please review the enclosed documentation and if all is in order, we request loan funds on 8/15/07 for recording on August 16, 2007." Declaration of Maurice Wainer ("Wainer Decl."), ¶ 8, Ex. G. Nowhere does that introduction suggest any hesitation on the part of First American to the Closing Instructions, nor does it clearly indicate its modification of the Instructions. Even Bushway testified that he believed the purpose of the Letter was to notify the lender of completion of the funding package and to send the lender wiring instructions for funding the loan–not to modify or reject the Closing Instructions. *See* Bushway Dep., 65.

It is not even clear that the Funding Letter was signed by *either* party. The FDIC insists that there is no evidence that anyone at IndyMac with any decision-making authority saw the Funding Letter, let alone signed it. To be sure, this is not its responsibility or fault; IndyMac should have had a procedure through which it would have ensured the Funding Letter would not have been overlooked. *See* Reply to DMSJ. Nonetheless, that does not change the fact that there is no evidence the Letter was seen by IndyMac, or, consequently, that it accepted the Letter's terms. An unauthenticated signature of an IndyMac representative appears on the FDIC's copy of the letter, though First American admits its copy does not. To explain away this inconsistency, First American contends that the fact that only the FDIC's copy contained such a signature demonstrates that the Funding Letter received by IndyMac was signed by an IndyMac representative. DMSJ, 10. But, by its own admission, First American has established that it

1  never received a written authorization to modify the Closing Instructions–if it had received one,
2  it would have a signed copy in its possession. Moreover, the evidence suggests that even if
3  IndyMac had signed the document, the person who signed it was "probably a clerk" with no
4  legal power to enter into a contract on IndyMac's behalf. *See* Gomez Dep., 166.

5  Of more concern to the Court, though, is that it appears as if the Funding Letter was
6  unsigned even by First American–further indicating its status as more of a cover letter than a
7  contract modification. The Funding Letter bears a typewritten name of First American's escrow
8  officer, D.J. Bushway, at the bottom of the letter. First American insists that this typewritten
9  name sufficiently qualifies as a signature. *See* Motion (citing *Donovan v. RRL Corp.*, 26 Cal. 4th
10 261 (2001)). The California Supreme Court in *Donovan* held that a typewritten name bound a
11 company to its promise in an advertisement because it showed, *inter alia*, "an intent to
12 authenticate the writing." *Id.* at 277. The context of an advertisement authentication differs
13 dramatically from this case. Indeed, there is no suggestion here that the signed name was
14 intended to be a signature; Bushway testified that the document "doesn't look like I signed it."
15 Bushway Dep., 69-70. He also indicated that he usually signs funding letters prior to sending
16 them out. *Id.* Thus, the typewritten name of Bushway did not serve as a signature.

17 Furthermore, First American gave IndyMac no consideration in exchange for releasing
18 First American from the Closing Instructions.[2] Assuming *arguendo* that the Funding Letter
19 changed the contract, it did so to the benefit of First American alone; IndyMac received no
20 benefit from the alteration. *See* Hinkle Dep., 95. First American's argument that IndyMac
21 received a benefit because it went through with the loan, *see id.*, is flawed; pursuant to the initial
22 Closing Instructions, First American was already required to do so.

23 But more importantly, the Funding Letter, included with the Closing Instructions, could
24 not have modified the specific requirement that First American must disclose knowledge of other

---

[2] First American suggests that First American received nothing from IndyMac pursuant to the original Closing Instructions. This argument misrepresents the facts: First American received money paid out of loan funds. Thus, it did receive consideration from the initial contract. *See* Reply to PSMJ, 11.

buyer transactions. First American's broad and ambiguous statement of conditions in the Closing Instructions that it would not follow appears intentionally designed to avoid liability for anything to which First American would later object. If First American were truly modifying IndyMac's Closing Instructions, it would have specified *exactly* what provisions to which it did not agree and would have indicated so on the Closing Instructions document itself. It could have easily expressed its objections to full disclosure of other transactions, and indicated its refusal to comply with such requirements. Instead, it attached a boiler-plate letter, accompanied by a *signed* Closing Instructions, with broad language about its intent only to comply with customary functions.

First American asserts that the FDIC's allegation that IndyMac would not have signed the loan had it seen the Funding Letter and known that First American did not intend to comply with the Closing Instructions reveals that the Funding Letter was obvious on its face that there was an intent not to comply with the relevant provisions. *See* Reply to DMSJ, 1 (citing Gomez Decl., ¶¶ 22, 24). Yet the very point is that the boilerplate Funding Letter–sent out with every single set of documents in preparation for a transaction–was not referenced in the version of the Closing Instructions signed fully by First American and was unclear in its broad, vague language. First American failed to highlight the significance of the Funding Letters nor did it indicate within the document any specific intent not to comply with the Closing Instructions. Even if the document were seen or read by IndyMac, it would nonetheless fail to put IndyMac on notice of what terms with which First American would not comply.

Whether or not the Letter was seen by or signed by IndyMac, its vague language, accompanied by a signed Closing Instructions–without any indication on the Closing Instructions document of an objection to any of its language, *see* Hinkle Dep., 95-96,–precludes a finding that the Letter supersedes the requirements of disclosure in the Closing Instructions.

### 2. Waiver of Modification Requirements

First American insists that even if the Funding Letter was unsigned and did not modify the contract pursuant to the Closing Instructions' requirements, IndyMac's conduct suggested that it waived the provision mandating modification procedures. IndyMac's underwriting

1  guidelines required that if there were any changes to the Closing Instructions, an alternate
2  settlement agent would be selected. Declaration of Linda Pasin ("Pasin Decl."), ¶ 6, Ex. D.
3  Because IndyMac received the Funding Letter, and then proceeded to fund the loan, rather than
4  objecting to the terms of the Letter or selecting an alternate settlement agent, First American
5  contends that it waived any requirement that modifications be in writing.

6  Along the same lines, First American also argues that IndyMac's funding of the loan prior
7  to receiving the Funding Letter is the equivalent of full performance of its obligations as set forth
8  in the Letter, and therefore bound IndyMac to the Letter's terms. The Funding Letter stated that
9  "[f]unding of this loan shall be considered your acceptance of the First American Title Company
10 position, your confirmation that all your conditions have otherwise ben satisfied . . . ." Funding
11 Letter. Thus, Defendant maintains that the Funding Letter, rather than the Closing Instructions,
12 constituted the final agreement between Defendant and IndyMac.

13 This argument essentially suggests that a party can force another to acquiesce to material
14 changes in a contract even when it does not respond or affirmatively accept them. This defies
15 California contract law. Silence is not consent to a contract, even when an offer states so. *See* 1
16 B.E. Witkin, Summary 10th (2005), Contracts § 193, 226; *Sorg v. Fred Weiscz & Assoc.*, 14 Cal.
17 App. 3d 78, 81 (1970) (citing cases). As a result, the Court finds that IndyMac did not waive its
18 modification requirements simply by funding the loan.

19 Therefore, because the Funding Letter did not modify the Closing Instructions or become
20 the operative contract, First American was required to comply with the Closing Instructions'
21 requirements.

22 **B.     Terms of the Funding Letter**

23 Even if the Funding Letter *had* validly modified the Closing Instructions, First American
24 would still have been obligated to report to IndyMac its knowledge of other transactions
25 involving Darling. The Funding Letter provided that First American would "perform only those
26 functions customarily handled by settlement agents processing loans in the geographic area
27 where the land is located and will not accept responsibility for the performance of any other
28 matters addressed in your closing instructions." That language is undeniably vague. There was

11

no "meeting of the minds" as to the terms in the Funding Letter. "'[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties . . . have taken some action related to the contract.'" *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 215 (2006) (quoting *Banner Entertainment, Inc. v. Super. Ct. (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 359 (1998). Neither party communicated to the other its understanding of the phrase "those functions customarily handled by settlement agents processing loans in the geographic area." As a result, any uncertainty as to the phrase's meaning must be interpreted "most strongly against" First American, which was "the party who caused the uncertainty to exist." Cal. Civ. Code. § 1654.

Critically, First American itself does not have a coherent policy of what the phrase encompasses and how to determine what it includes. Hinkle Dep., 91, 120. It does not provide a list to its agents of what functions they agree to perform, and, as a result, each agent exercises her independent–and inconsistent–discretion in determining what qualifies as a customary function. *Id.*; *id.* at 121. The vague, broad, and ambiguous language allows First American to interpret its language as broadly as is convenient for it, without ever providing meaningful advance notice to the other party before the term is triggered.

Even if the Court were to overlook the vagueness problems with the language in the Funding Letter, First American would still have breached the agreement. As discussed above, the relevant language in the Funding Letter establishes that First American would "perform only those functions customarily handled by settlement agents processing loans in the geographic area where the land is located and will not accept responsibility for the performance of any other matters addressed in your closing instructions." First American argues that in Southern California, the geographic area where the transaction occurred, escrow holders do not typically inform the lender if a buyer is involved in another transaction. *See* Declaration of Vicki Hinkle ("Hinkle Decl."); *see also* Pasin Decl., Ex E. Thus, First American contends that its failure to reveal its knowledge of other transactions was in line with customary practice in Southern California.

To be sure, Hinkle has over twenty-five years of escrow experience, including with two

12

1 of the largest title insurance companies in the country. *See* Hinkle Dep. There is certainly good
2 reason to think that she is aware of customary practices in the escrow business in Southern
3 California. Nonetheless, as the FDIC points out, her declaration contradicts her prior testimony,
4 during which she indicated that First American customarily would typically abide by closing
5 instructions that required them to provide notice of other loans by the borrower. *See* Hinkle
6 Dep., 79. That testimony is corroborated by Bushway, who stated that complying with closing
7 instructions is, in fact, a function customarily handled by settlement agents. *See* Bushway Dep.,
8 69.

9       The FDIC provides the Court with its own "expert" opinion as to the customary practice
10 in Southern California through the declaration of Todd Cuffaro, who works in the financial and
11 mortgage industries. *See* Declaration of Todd Cuffaro ("Cuffaro Decl."). He testified that "the
12 main function customarily handled by settlement agents processing loans in Southern California
13 is to fully comply with a lender's closing instructions." *See id*. First American objects to the
14 lack of foundation for Cuffaro's testimony, because it argues he has no direct experience with
15 the escrow industry. Yet this objection, which the Court overrules[3], reveals the fundamental
16 problem with the Funding Letter; it is completely vague as to what qualifies as "customary" in
17 Southern California, how that term is to be determined, and who shall decide what is customary.[4]
18 Moreover, similar problems exist with First American's own "expert," Charles A. Hansen,
19 whose experience consists of working as a law professor, at attorney, and as an expert witness.
20 *See* Pasin Decl., Ex. E.

21       As a last-ditch effort to evade its responsibilities under the Closing Instructions, First
22 American contends that it could not have complied with the Closing Instructions' requirement
23 that it provide notice of other transactions regarding the borrower because to do so would violate

---

[3] All other evidentiary objections are overruled to the extent relied upon in this Order and granted where the evidence is not addressed.

[4] Moreover, the FDIC has provided additional evidence that it is "customary" to alert to indicators of mortgage fraud. The FDIC insists that purchasing many properties at once is a telltale sign of mortgage fraud.

its privacy policies, as well as its privacy requirements and its obligation[5] to protect privacy information in regards to an escrow agent's records. *See* Opp'n to PSMJ, 23-24. First American's privacy policy specifies that it will only release a customer's information to outside parties if necessary to provide the product or service the customer requested or as permitted by law. Nonetheless, the Court deems this argument implausible; First American was not required under the terms of the Closing Instructions to reveal any confidential information to IndyMac. Instead, if it wished to preserve any knowledge of transactions, it should not have signed the Closing Instructions. Alternatively, it could simply have notified IndyMac that it could not comply with that specific provision.

Finally, First American also raises, for the first time, in its Reply brief to its DMSJ, the suggestion that it actually did not know of the other relevant transactions that the FDIC contends it was required to disclose, even though Bushway himself facilitated all three transactions.[6] *See* DMSJ Reply, 18. Though First American responded in its Answer by admitting knowing of the relevant transactions, Bushway has recently testified that he cannot recall presently whether he knew in 2007 that he had been handling multiple escrows for Darling.

After considering this evidence, the Court finds that no reasonable jury could interpret Bushway's testimony to mean that he did not know in 2007 that he was handling multiple transactions for Darling. The three loans were issued almost simultaneously, making it hard to imagine that Bushway could forget the others but remember much about this transaction. It is difficult to imagine an escrow agent forgetting two high-priced transactions for the same borrower at virtually the same time. Though First American attempts to stretch Bushway's statement to create a triable issue, Bushway's statement was limited only to his present

---

[5] The Court rejects First American's reliance on Section 1985.3 of the California Code of Civil Procedure, which, contrary to First American's representations, does not address mortgage loans but addresses subpoena requests. *See* Cal. Code Civ. Proc. 1985.3.

[6] The Court does not overlook First American's argument in its Opposition to the PMSA that one of the other two transactions that it did not report to IndyMac did not actually close until after the transaction at issue in this case.

memory–in no way did he indicate he did not know in 2007 of the other transactions. Moreover, despite First American's argument, it affirmatively admitted its response to the question: "Admit that, at the time the Darling Transaction closed, You knew that Steven Darling had purchased [another property]." *See* Plaintiff's Fact 40.

Accordingly, the Court finds that First American was required to comply with the Closing Instructions and to report its knowledge of other Darling transactions.

### C. Damages/Causation

In its Opposition to the PMSA, First American argues that it cannot be liable for the damage inflicted by Darling's default because its failure to disclose the other transactions was not the sole cause of IndyMac's damages. In support of this theory, First American points to a number of red-flags that IndyMac purportedly overlooked in Darling's application. As a result, First American challenges the FDIC's claim that IndyMac would not have entered into the Darling loan had it known of his other transactions. Instead, First American insists that IndyMac, by way of the FDIC, is shifting the blame for its own errors in failing to perceive glaring problems in Darling's application onto First American. For example, IndyMac allegedly failed to pick up on inconsistencies in Darling's application, such as the fact that the 21 year-old claimed to have worked for the past five years, earning $200,000 annually, even though his credit report indicated he had been in the military. *See* Gomez Dep., 76-79. First American also proffers evidence that IndyMac inadequately attempted to verify Darling's information when it only verified Darling's employment through his real estate agent, who stood to collect a significant commission of $90,000 on the transaction. Gomez Decl. 136-43. Finally, it points to the fact that Darling's educational background–which did not include a college degree–fell short of the requirements for his purported employment. *See id.*

This argument fails as a matter of law. Contributory negligence is not a defense to a breach of contract claim. *See Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 402 (2000). Thus, any negligence of IndyMac in failing to investigate adequately Darling's background did not excuse First American's breach. Likewise, the FDIC need not establish that the breach was the *only* cause of its injury. Instead, it must only show that the breach was a

15

substantial factor in causing its damages. *See Bruckman v. Parliament Escrow Corp.*, 190 Cal. App. 3d 1051, 1063-64 (1987). The FDIC's evidence indicating it would not have entered into the loan had it known of the other transactions more than adequately meets this standard. First American provides no evidence to contradict this evidence; instead, it offers pure speculation as to other potential causes of the breach. Though the Court does not find that IndyMac was blameless or could not have predicted Darling's default, First American cannot avoid the implications of its breach.[7]

### D. Public Policy Concerns

Finally, both parties assert public policy arguments. First American contends that requiring escrow companies to be responsible for the lender's underwriting is unduly burdensome. This misstates the Closing Instruction requirements. As the FDIC points out, its language did not mandate closing agents to conduct nationwide searches of their databases; rather, when a closing agent had actual knowledge of another transaction, he must notify IndyMac and stop the closing. *See* PMSA, 4 n.2. Allow escrow companies to evade responsibility for any conditions to which they agreed without specifying those objections obliterates the protections contracts provide. Moreover, public policy concerns certainly favor prohibiting a party to modify a contract simply by attaching to its contract a vague letter eschewing responsibility for certain obligations without specifying the precise terms it aims to modify.

For these reasons and the discussion above, the Court finds that First American was obligated to comply with its contractual obligations pursuant to the Closing Instructions and did not modify those Instructions through its vague Funding Letter. Nevertheless, even had the Funding Letter modified the terms of the contract, First American would still have been obligated to report its knowledge of other transactions by Darling.

---

[7] The same is true for First American's attempt to shift the blame onto IndyMac and point to its failed underwriting systems. IndyMac may indeed have been negligent and careless in its handling of these transactions; yet such evidence is irrelevant to First American's breach of contract.

**IV. Disposition**

Accordingly, the Court DENIES Defendant First American's Motion for Summary Judgment and GRANTS Plaintiff the FDIC's Motion for Summary Adjudication as to liability.

IT IS SO ORDERED.

DATED: August 24, 2011

*David O. Carter*

DAVID O. CARTER
United States District Judge